## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 13-60094-CIV-ROSENBAUM/HUNT

WILLIAM TATE,

        Petitioner,

v.

SPIRIT AIRLINES, INC.,
A Delaware corporation,

        Respondent.

_____/

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Spirit Airlines, Inc.'s Motion for Summary

Judgment [D.E. 17]. Petitioner William Tate, an airliner captain, filed this action seeking review

of a determination by the Spirit Airlines Pilots' System Board of Adjustment ("Board") affirming

Respondent Spirit Airlines, Inc.'s decision to terminate Tate's employment with Spirit. *See* D.E. 1.

The Board concluded that Spirit had "just cause to effect the termination of Captain William Tate"

because of Tate's lengthy and repeated record of anger-management and judgment problems and the

"serious concern" that they represented "to an employer charged with safely operating aircraft." *See*

D.E. 18-2 at 81-82.[1] Tate appeals the Board's ruling, asserting that it must be vacated because the

Board allegedly acted in excess of its jurisdiction and denied Tate due process. *See* D.E 1 at 10-12.

_____

[1]Some docket entries contain more than one page-numbering system. Where that occurs, this Order refers to the numbering system imprinted across the top of every page by the Court's CM/ECF system, except where transcripts are concerned. For transcripts, this Order refers to the original page-numbering system; the number before the colon reflects the page number and the number following the colon refers to the line number.

Spirit has moved for summary judgment.  Because the Court concludes that no material facts are in controversy and the Board neither acted in excess of its jurisdiction nor denied Tate due process, the Court now grants Spirit's Motion for Summary Judgment [D.E. 17].

### *I.  Material Facts*

**A.  Background**

1.    Petitioner William Tate is a beneficiary of the Collective Bargaining Agreement ("Agreement") entered into between Spirit and the Air Line Pilots Association ("ALPA").  *See* D.E. 1-1; D.E. 30 at ¶ 19.

2.    Among others, the Agreement includes the following provisions:

> 19.A.1.    A pilot will not be disciplined without just cause.  In those instances where the Company contemplates discipline of a pilot — amount to discharge . . . — such disciplinary action will not be imposed until the Company first conducts an impartial, reasonable, and expeditious investigation of the alleged cause.

> 19.A.2.    No discipline will be imposed until a fact-finding meeting is held with the chief pilot, the pilot, and his [ALPA] representative(s) (if desired).  Such meeting will be held within 10 working days of the date of the Company's issuance of a written Notice of Investigation advising the pilot of the investigation and reasons for it . . . .

> 19.A.3.    A Notice of Investigation must be issued within 15 working days of the date upon which an individual with managerial authority in the Flight Operations Department has, or would reasonably be expected to have, knowledge of the circumstances giving rise to such investigation.

> * * * * *

> 19.D.2.    All time limits within this Section 19 shall be

complied with by the Company and the pilot.  If the Company does not comply with the time limits, the grievance shall be considered denied and appealable. In the event the pilot fails to comply with the time limits, the Company's action shall be sustained.

* * * * *

21.A.   In compliance with Section 204, Title II of the Railway Labor Act, as amended, a System Board of Adjustment is established for the purpose of adjusting and deciding disputes that may arise under the terms of this agreement, any amendments or additions thereto, and that are properly submitted to it. . . .

* * * * *

21.C.   The Board shall have jurisdiction over disputes between any pilot covered by this Agreement and the Company submitted to it by [ALPA] arising out of grievances concerning the interpretation or application of any of the terms or provisions in the Agreement and disciplinary grievances submitted by non-probationary pilots. . . .

D.E. 1-1.

## B.  The Events that Predated the Issuance of the Notice of Investigation

3.  In 2004, Spirit issued the following letter to Tate:

* * * * *

In May, 2003, following a Notice of Investigation that was issued as a result of engaging in unprofessional and disruptive conduct that undermined customer confidence in Spirit Airlines, you were suspended without pay for a period of fourteen (14) days.  At that time, you were warned that any additional occurrences of this type of conduct may lead to termination . . . .

Thereafter, on August 4, 2003, you were counseled regarding your continued unprofessional and unacceptable conduct relating to your inability to control your temper towards a co-worker.  Since this co-worker was a Flight Attendant, and a subordinate of yours, it had the

-3-

potential to create a hostile work environment for that individual. As previously advised, that was the second occurrence for which your anger adversely affected your relationship with your co-workers. At that time, it was strongly recommended that you seek professional guidance to assist in controlling your behavior. Moreover, you were provided an additional warning that should you continue to conduct yourself in this same manner without any evidence of participation in an anger management program, you would be disciplined accordingly. . . . You failed to seek assistance to address your conduct.

Finally, in January 2004, you were counseled for your failure to respond to a directive by the Chief Pilot's office. As a result, you were given a disciplinary letter that would remain in your file for twelve (12) months. Again, you were warned that any acts of insubordination, refusal to follow instructions, and/or violations of Spirit company policies and procedures during this period may result in further discipline up to any [sic] including termination . . . .

Accordingly, based upon your continuous course of unacceptable conduct in violation of Company policy, and the previous warnings and discipline relating to that conduct, in conjunction with your failure to seek appropriate professional guidance in controlling that conduct, your employment with Spirit Airlines has been terminated effective February 18, 2004. . . .

D.E. 18-2 at 66-67 & 67 n.8.

4. Despite this letter terminating Tate's employment with Spirit, Tate was not terminated. Instead, following a grievance to the Board, Tate was reinstated with a 21-day suspension because the Board concluded that Spirit had failed to establish any cursing, abusive, or disruptive conduct by Tate as described in the hearsay report, but it noted that Tate had previously received a 14-day suspension that he had accepted without protest for using loud, abusive, and vulgar language while on a cell phone and seated in the cabin. *Id.* at 66-67. In further justifying the 21-day suspension, the Board pointed to a report that a flight attendant had to ask Tate more than once to turn off his cell phone and that Tate continued to text, despite federal regulations. *Id.* at 67.

5.   In 2009, Tate was the subject of an investigation for abusing Aetna, one of Spirit's vendors.  *See id*. at 68.  More specifically, Tate sent a profane and abusive message to Aetna while attempting to resolve a benefits matter.  *Id.*; *see also* D.E. 1-8 at 507:12-:4.

6.   In response to the 2009 incident, Spirit advised Tate of the following:

> You must attend professional anger management counseling sessions on a regular and ongoing basis through August, 2010.  Scheduling of and payment for these sessions will be your sole responsibility.  You must provide the Company with the name of the facility where you are obtaining treatment, a schedule of your treatment dates and monthly reports from the treatment facility confirming your attendance at these sessions.

> * * * **

> As a Spirit employee, you must comply with established and expected standards of behavior as set forth in the employee handbook. . . .

> Please be advised that your failure to comply with any of these requests will subject you to further discipline, up to and including termination of your employment from Spirit Airlines, Inc.

D.E. 18-2 at 4-5; D.E. 1-8 at 508:2-:4.

7.   On August 20, 2010, Tate was serving as the captain on a Spirit flight from Port-Au-Prince, Haiti, to Fort Lauderdale.  *See* D.E. 1-8 at 509:21-:25.  Tom Gilmore, who is an instructor pilot for Spirit, was serving as the flight's first officer.  *See* D.E. 1-6 at 87:8-:10.

8.   Also on August 20, 2010, following his return to Fort Lauderdale, Gilmore called Joseph Houghton, who was then the Director of Training and Standards for Spirit, and advised him that he had concerns about Tate's behavior during the August 20, 2010, flight.  D.E. 1-6 at 98:18-99:19; *id.* at 162:10-:23.  According to Gilmore, Gilmore told Houghton that Tate had disconnected the autopilot and the autothrust as the flight climbed from Port-au-Prince and had instructed Gilmore

to put the speed at 340 knots on the flight control unit, actions that Gilmore felt concerned about. D.E. 1-6 at 88:15-99:19.  Gilmore stated that he further informed Houghton that Tate had executed a "very steep and aggressive climb from [340 knots] to a lower speed, . . . result[ing] in a very, very high rate of climb." *Id.*  In addition, Gilmore reported to Houghton that Tate had only a very narrow, limited view on his navigation display, and he was trying to hand-fly the plane. *Id.*  Gilmore also explained that when they landed, he attempted to discuss with Tate the importance of complying with Spirit's flight standards, but Tate became angry and yelled at Gilmore and then left the cockpit. *Id.*  As Gilmore walked to his car, he further indicated, he received a telephone call from Tate that had been routed through crew scheduling. *Id.*  During this call, Gilmore stated, Tate brought up the subject again and became angry, "name-calling pilots in the group and going on a tangent." *Id.*

9.  Houghton reported Gilmore's telephone call to Chris Grazel, who was the Vice President of Flight Operations at the time.  D.E. 1-6 at 162:10-163:8.

10.  Grazel subsequently had a discussion with Tate.  *See* D.E. 1-8 at 597:18-599:17. Although the parties agree that the Port-au-Prince flight was discussed during this conversation, they do not agree on specifically what was said.  *See id.*; D.E. 1-8 at 530:21-532:18.

11.  On approximately August 24, 2010, at his own request, Tate began taking leave under the Family Medical Leave Act.  *See* D.E. 1-8 at 509:3-:5, 600:5-604:22, 533:11-:12.

12.  Originally, the FMLA leave was scheduled to last from August 24, 2010, through September 30, 2010.  D.E. 1-8 at 614:5-:21.

13.  Tate's FMLA leave was extended until October 17, 2010, upon approval and authorization by Tate's family counselor.  D.E. 1-8 at 616:20-:25.

14.  Houghton became the Vice President of Flight Operations on October 1, 2010.  D.E. 1-6

at 161:13-:16.

15.   On October 4, 2010, Tate called Aetna, who provided insurance benefits for Spirit employees, to find out why he had not yet received benefits for being out on FMLA leave.  *See* D.E. 1-8 at 534:17-540-:2.  During the telephone call, as Tate himself admitted, Tate became angry and used profanity.  *See id.*  Aetna complained to Spirit.  *See* D.E. 1-6 at 131:4-132:25.

16.   On October 20, 2010, Lucy Singleton-Mana, then Spirit's Manager of Labor Relations and Flight Operations Coordination, D.E. 1-6 at 129:4-:19, sent a memorandum to Houghton regarding a conversation that she had had with Tate on October 4, 2010, in regard to the Aetna incident.  In this memorandum, Singleton-Mana wrote,

> [Tate] went from being very angry to crying and then angry.  He stated his doctor wanted him to go on medication but he did not want to take the medication.  He also stated his counselor would not see him any more due to Aetna hasn't paid the bill and they owe her around $2,000.  I then gave him the info for our employee assistance program and told him they maybe able to help him.  He said if he would have known that he was not going to get paid he would have never gone out on FMLA.

D.E. 18-2 at 72.

17.   Also on October 20, 2010, in response to a request that Houghton made, Gilmore provided Houghton with a written statement regarding Tate's conduct during and after the August 24, 2010, flight from Port-au-Prince to Fort Lauderdale.  D.E. 1-6 at 116:16-117:16.

18.   On October 22, 2010, in response to a request that Houghton made, Spirit Captain and Check Airman Robert Webster submitted a written statement to Houghton regarding Gilmore's complaints to Webster about the August 20, 2010, incident with Tate and about Webster's own prior problems with Tate.  *See* D.E. 1-6 at 79:7-83:16.  On August 20, 2010, Webster had mentioned to

Houghton Gilmore's concerns regarding the August 20, 2010, flight from Port-au-Prince.  *See id.*

## C.  The Notice of Investigation, the Subsequent Hearing, and the Termination of Tate

19.  On October 27, 2010, Spirit sent Tate a letter that stated,

> This letter will serve as a Notice of Investigation pursuant to Section 19 of the Collective Bargaining Agreement . . . to address allegations against you concerning the following matters: your inappropriate behavior in violation of Company policies, including but not limited to your conduct while speaking with Aetna and other Spirit employees on or about October 4, 2010, your conduct towards the First Officer on NK 952 PAP-FLL on August 20, 2010 (including conduct after that flight), your conduct towards T. Rowe Price on August 4, 2010, certain allegedly threatening comments to other Spirit pilots, allegations that you were lying on the floor of the cockpit on a flight from SJU on or about February 2010, and your alleged failure to follow Company policies/procedures/standards and to comply with Company instructions including but not limited to the following matters: you [sic] alleged failure to operate NK 952 PAP-FLL on August 20, 2010 according to Company policies/procedures/standards and your failure to comply with the requirements of your August 19, 2009 resolution letter. . . .

D.E. 18-2 at 5-6.

20.  Joseph T. Houghton, then the Vice President for Flight Operations for Spirit, explained his reasons for issuing the Notice of Investigation:

> I became concerned about the overall picture.  So, as a picture, you begin to build on all these items . . . .  But I don't ask for input when input comes in.  When I don't ask for input and input comes in, it registers something.  When I see a — some of the providers for health or a 401K or whatever and letters come in that I don't ask for, it becomes an area that I certainly need to look at.  When I get a pilot that comes forward with a letter and documents, exactly what happened, then it does tend to give some credibility to the others that have called.  So with that, it builds a picture, and hence the purpose of the NOI.

> * * * * *

Another question that came to mind was if he had, indeed, gone out on FMLA and he had, indeed, sought counseling and was on any type of medication, was that recorded properly and does he — can he legally exercise the privileges of a medical certificate.

* * * * *

[And there] was a previous NOI in which there had been, my understanding is, an ultimatum given, sort of in the form of sort of a last chance, if you will, that either Captain Tate conform to what was prescribed or he would be subject to termination and that he had agreed, indeed, to what had been prescribed in that August 2009 NOI.

D.E. 1-6 at 177:20-178:12; *id*. at 179:19-180:12.

21.  On November 3, 3010, Houghton conducted a fact-finding meeting on the Notice of Investigation.  *See* D.E. 18-2 at 7-9.

22.  The following day, November 4, 2010, Houghton sent Tate a letter stating that during the November 3, 2010, meeting facts were confirmed regarding the following:

-   After an investigation into inappropriate conduct by you, you received a letter dated August 19, 2009 which required you to comply with certain standards of behavior required pursuant to Company policy as a condition of your continued employment with Spirit.  Despite this, you became angry and used profanity several times on October 4, 2010 when you were speaking to Aetna Supervisor Steve Parris. . . .  During the investigative meeting, you admitted to using profanity on the call with Mr. Parris "at least 3 times."  Your behavior in this regard was unacceptable and a clear violation of Company policy. . . .

-   Failure to comply with Spirit Airlines standard operating procedures . . . while acting as Pilot in Command during revenue flying.  On August 20, 2010 you were the Captain of a Spirit aircraft with First Officer Tom Gilmore on board. You commanded him to assist you with performing numerous non-standard flying procedures such as selecting 340 knots (slightly below the maximum allowable speed) while hand flying the aircraft to 27,000. You also selected arc on your

ND as low as l0nm while flying in a mountainous terrain in a non-radar environment. When I asked separate questions about the specifics of each of these you confirmed they did indeed take place and went on to explain exactly why you performed the actions you did. When asked whether you thought an aircraft should always be flown standard you replied, "Flying standard is for flying in bad weather or on a CAT III approach." You further elaborated that pilots shouldn't practice in bad weather.  When asked why you chose to fly the aircraft faster than standard you replied that it was to make up time due to running late. This is not standard procedure. When further asked why you fly non-standard you said you have to practice.  Practicing or hand flying per the standards is very different from flying the aircraft non-standard. You further elaborated that you could name at least 6 pilots who are going to crash airplanes. You were asked if you spoke to First Officer Gilmore in an angry manner when he challenged your non-standard flying. You responded that you did not raise your voice but told him to put away a magazine (meaning he needed to pay attention) because you were "flying 340 knots in a non-radar environment."  You admitted that after the flight you called crew scheduling and asked them to transfer you to First Officer Gilmore's personal cell phone. When asked why you had crew scheduling transfer your call to First Officer Gilmore's personal cell phone you stated, "because he's my friend." First Officer Gilmore reported that you continued to express your opinions and philosophy on Flight Operations. He reported that your anger increased during the call to the point he hung up.

- Failure to comply with Spirit Airlines FOM policy and Federal Aviation Regulations regarding . . . [flying with a medical condition or taking medication or receiving other treatment for a medical condition that results in not being able to meet the requirements for the medical certificate necessary for pilot operation].

*Id.* at 7-8; D.E. 1-3.

23.  In addition, the November 4, 2010, letter explained,

The Company asked if you had sought medical treatment as required

-10-

in the August 2009 letter. You produced a document indicating that you had been seeing a Licensed Certified Social Worker ("LCSW"). In a phone call to the Company on or about October 4, 2010 you informed the Company that you needed to go on anti-anxiety medicine. In a previous conversation with then Vice President of Flight Operations, Chris Grazel, you stated that you needed to go on medication and take some time off due to your situation at the house. You ended up voluntarily going on FMLA. When asked why you went on FMLA during our fact finding NOI on November 3, 2010 you said that you were diagnosed with anxiety and had panic attacks. You further stated that the LCSW wanted you to see a medical doctor and go on medication for your condition and you said that you were taking medication and seeing a medical doctor. You then came off FMLA on October 18, 2010. When asked why you came off of FMLA you said that you needed the money and didn't realize that you would not be getting paid for a period of time.

During our NOI meeting, you were asked if you had reported any of this information to your AME (Aviation Medical Examiner). You stated, "No." You were then asked if you were aware that these items needed to be reported to your AME and you responded, "Yes." You were then asked if you had been cleared to fly while taking medication and you responded that you had not seen your AME (indicating a no response). You explained to the Company that when you (meaning anyone) are under extreme stress (which you said you had encountered) the brain chemistry changes and you need medicine to stabilize it. You said your situation is getting better but that you are not completely OK yet. By taking yourself off of FMLA and reporting for duty while taking medication that had not been approved by your AME you were violating federal regulations. The Company pulled you from flying to investigate this situation. Normally a pilot is grounded by the FAA until all symptoms of a psychiatric condition have been treated. Further, the FAA requires a consultation status report, a written statement prepared by the pilot describing his or her history of antidepressant use and mental health status as well as additional items. Additionally, if a pilot discloses that he or she is consulting a therapist (e.g. for anxiety) but there is no clinical diagnosis for depression, a pilot will not be allowed to fly while undergoing treatment. You indicated that you have been undergoing treatment and taking medication without disclosing any of these items to the FAA and then reported for duty as a pilot for Spirit Airlines. You called your LCSW (Stacy) during our NOI to offer her opinion to us. Stacy explained that you have been having panic attacks and

-11-

that you were under an exceptional amount of stress and that you did not take her recommendation for you to take a minimum of 6 months off.

Consistent with its duties as a common carrier by air, a core value of Spirit is that we put safety first in all the services we provide to our passengers and to one another.  Page 73 of Spirit's Employee Handbook provides that "Spirit Airlines values safety above all else. We must protect our passengers, our employees, and the general public.  Spirit Airlines' safety efforts must meet and exceed the safety standards of the airline industry."  Spirit is committed to and required to promote air safety and exercise the highest possible degree of care. Spirit's Employee Handbook also clearly states that "the Company expects employees to follow rules of conduct that will protect the interests and safety of the Company and its employees and further states that violation of safety regulations or standards are serious and terminable offenses."  See Spirit's Employee Handbook, pages 44 and 45.  As Pilot in Command, you are responsible for the safety of the aircraft and both current and future crews and passengers.  You are responsible to ensure that each flight is, in all respects, accomplished in a safe and legal manner.  Additionally, Spirit has clear standards regarding conduct expected of employees and although you were warned that your behavior had to change in order for you to remain employed at Spirit, you have continued to exhibit behavior inconsistent with Spirit's requirements.  Further, you have violated the FAA standards previously discussed.

Based on all of the facts and circumstances previously discussed, it is Spirit's determination that your employment is hereby terminated effective immediately. . . .

D.E. 18-2 at 8-9; D.E. 1-3.

24.  At no point during the Notice of Investigation process or before Spirit terminated Tate's employment did Tate suggest that Spirit had failed to comply with the time limits for issuing a Notice of Investigation, as set forth in the Agreement.

**D.  The Grievance Procedure**

25.  On November 22, 2010, ALPA, on behalf of Tate, appealed Spirit's determination to the

Board.  *See* D.E. 1 at ¶ 10.

26.  More than a year later, on December 15, 2011, ALPA filed a document seeking to dismiss the Notice of Investigation — and subsequently re-styled as a motion for summary judgment — asserting that all of the discipline was untimely under the Agreement and that Spirit had failed to provide notice to Tate of the allegations against him that "played a material role in the decision to terminate him."  *See* D.E. 1-4.

27.  The Board denied ALPA's motion for summary judgment.  *See* D.E. 1-5.  In reaching this conclusion, the Board explained,

> If in fact AL[PA] is convinced that alleged procedural infirmities trumps any consideration of the merits it has the option of resting its case once management presents facts sufficient to constitute a *prima facie* case for dismissal. At this early juncture, however, sufficient facts are either contested or unavailable to consider issuing a ruling for Captain Tate on a procedural infirmity basis only.

> Additionally, I agree with the Carrier that the parties' collective bargaining agreement does not vest the undersigned Chairman with the authority to resolve the merits of a case prior to a hearing on the merits.  As noted by the Employer, the parties have not incorporated any concepts of pre-trial motion law into their collective bargaining agreement. . . .

*Id.* at 11.

28.  The Board held a three-day hearing on Tate's grievance from January 10 through 12, 2012, in Fort Lauderdale, Florida.  *See* D.E. 1-6, D.E. 1-7, D.E. 1-8.

29.  During the hearing, Tate testified on his own behalf.  He was given the opportunity to respond to a number of questions, including several questions concerning multiple restraining orders that had been sought or entered, or both, against him and two criminal cases that were then pending against him.  *See* D.E. 1-8 at 551:18-593:22.  More specifically, Tate had the chance to answer

questions concerning separate restraining orders sought or obtained against him by Ishmael Nieves, Resa Nakol Jones and Franklin Jones, Wendy Salter, Chad Simmons, Valery and Richard Coulson, Erin Hurwitz, and Laura Chenault.  *Id.*

30.  Among other witnesses, ALPA called James Lewis to testify.  *See* D.E. 1-7 at 443:17. Lewis, an attorney, had represented Tate in the past and was in the process of representing him in state-court criminal proceedings at the time of the grievance hearing.  *See id*. at 444:7-445:15.  Lewis testified that, at that time, he was representing Tate in two cases pending before the Broward County Circuit Court: (1) grand theft in the third degree and (2) resisting arrest without violence and battery.[2] *Id.* at 445:16-446:12.  Lewis further explained that he had previously represented Tate in a case charging burglary of a dwelling with an assault, where the jury had found Tate not guilty after five minutes of deliberation.  *Id.* at 446:21-447:2.  In addition, the probable-cause affidavit filed in support of the second case was admitted into evidence.  *Id.* at 464:22-468:25.

31.  Among other witnesses, Spirit called Philip S. Deming, a professional consultant in the areas of risk analysis, risk assessment, and human resources.  D.E. 1-7 at 293:9-294:7.  Although Spirit sought admission of Deming as an expert in the area of workplace threat assessment and security, *see* D.E. 1-7 at 293:21-299:5, the Board permitted Deming to testify only as to his assessments regarding Tate's relationship with Gilmore. *Id.* at 303:15-304:23.  Deming testified that in evaluating Tate's behavior with respect to Gilmore, he conducted a search of publicly available records, which included the records pertaining to restraining orders and criminal charges discussed above.  *Id.* at 305:17-306:14.  He concluded that if Spirit were to terminate Tate's employment, the

---

[2]After the Board issued its decision and the process had been completed, the two criminal cases were ultimately dismissed.

termination would be "high risk." *Id.* at 322:25-325:5. Indeed, Deming characterized terminating Tate as "the highest risk separation I would ever be involved in," in thirty years of such work. *Id.* at 325:4-:6. He further expressed concern that "judgment is a key component of representing the airline; and if [Tate] exercises inappropriate judgment off work, how is he going to conduct himself when he is commanding an aircraft with revenue passengers?" *Id.* at 346:4-:16.

32. Although Tate continued to argue that Spirit's Notice of Investigation was untimely, *see* D.E. 18-2 at 32, the Board ruled on the merits of the grievance. *See, generally,* D.E. 18-2.

**E. The Board's Decision**

33. On July 12, 2012, in a 2-1 decision, the Board denied Tate's grievance and concluded that Spirit "had just cause to effect the termination of Captain William Tate . . . ." D.E. 18-2 at 82. In reaching this conclusion, the Board explained,

> In this case the Company has painted a picture of a pilot that has lost his social filter and governor. Since at least 2003 Captain Tate has had serious anger management issues to the extent that by 2004 he had been twice suspended (14 and 21 days), the last suspension the result of an arbitrator converting a discharge due to insufficient evidence by the Carrier. In 2009 he is again given an NOI over anger issues toward a vendor of the Company. Captain Tate is accorded yet another chance to get his anger issues under control and ordered to undergo anger management counseling. As noted, if he completed the requirements outlined for him, it was without effect. If he did not complete the program (as Paul Olechowski asserted) he squandered a golden opportunity.
>
> If the above events are not sufficient to put management on notice that Mr. Tate's decision-making abilities are problematic, a review of the civil and pending criminal records provides more concerns regarding Mr. Tate's character and decision making prowess to operate an aircraft.[] Clearly, a fair reading of the evidence record is that nothing has changed since 2003. I[f] anything, matters have degenerated to the extent that Captain Tate now finds himself defending an assault charge against a police officer (and a subsequent

motion to revoke bond by the States' Attorney) in the criminal forum, a serious concern to an employer charged with safely operating aircraft.

Spirit has made it a point to standardize flying and, thus, the Grievant's alleged statement that "the book will get you killed" (denied by the Grievant) is disturbing. As outlined by Mr. Houghton, "I am a believer that standards and flying by the book, so to speak, is a safer way of doing business, versus having a lot of different ways of people going into the cockpit and flying and doing things differently and not knowing what to expect from each other." . . . He continued: "So. . . we worked very hard from the moment I stepped on at Spirit Airlines, conducting meetings with every check airman on there to talk about the importance of flying standard and adhering to standards.". . . First Officer Gilmore's experience gave rise to Mr. Houghton questioning Captain Tate's overall ability to conform to the standards outlined by the Carrier. This Board is not in a position to second guess two pilots, Messrs. Gilmore (who alleged Captain Tate's flying "is the most reckless I have ever seen in my professional aviation career" and whom the Grievant acknowledged had no "vendetta" against him) and Houghton (Vice President of Flight Operations who characterized it as "inappropriate"), when they express reservations regarding the decisions the Grievant made flying out of Port-au-Prince. Both concluded that the Grievant tended to pick and choose which standards he would fly by and when they applied, and there is a basis in fact for this determination. His Port-au-Prince (and life) decisions legitimately gave rise to question his "cockpit resource management," or "crew resource management." . . . or Captain Tate's willingness to perform his job in the safest manner possible. In Houghton's words: "But what we never want is somebody to be out on the line doing their own thing and doing it differently than the way it's been prescribed and the way it's been trained." . . . . Training will not ameliorate Captain Tate's judgment issues both in and out of the cockpit. I credit the Carrier's conclusion that there is nothing in this record indicating that Captain Tate can be relied on to conform his behavior to the expectations and safety mandates of Spirit Airlines. Sadly, nothing has changed since 2003, as we see it. The record is replete with instances showing Mr. Tate's lack of self-control and unwillingness to conform his conduct to reasonable norms of behavior. Sound judgment and common sense in decision making are core values at Spirit, and we see no reason to upset management's judgment on both issues, given this specific evidence record.

D.E. 18-2 at 80-82.

    34.  The Board was also expressly noted,

> So there is no misunderstanding regarding our analysis, the issue is
> not whether Captain Tate has ever been convicted of a crime or
> whether he can offer an explanation or mitigation for the numerous
> protective orders (there are nine of them accumulated in a ten-year
> period) secured by private citizens against the Grievant, or whether
> Captain Tate manages to escape conviction of a crime (to date, he has
> been successful). Rather, the issue is the Company's legitimate
> concern raised by an airline Captain who continually finds himself the
> subject of such orders and/or criminal prosecutions by the State of
> Florida.  This Board cannot rule that management was unreasonable
> in concluding that Mr. Tate's conduct, albeit off duty, potentially
> affects his ability to make safety decisions critical to flying an
> aircraft.  Another way of saying this is the Grievant's decision-
> making "governor is problematic." This is not a medical or a
> psychological assessment. Rather, it is simply a matter of character
> and decision-making prowess which management determined Mr.
> Tate lacks. In this case, and under this specific evidence record, that
> determination should not be usurped by a System Board not charged
> with operating an airline in the safest possible manner.

D.E. 18-2 at 81 n.18.

    35.  Finally, the Board observed, "in the context of this case, we credit Phil[]ip Deming's

conclusion regarding the 'judgment' required of an airline pilot.  In his words, 'his judgment is a key

component of representing the airline, and if he exercises inappropriate judgment off work, how is

he going to conduct himself when he is commanding an aircraft with revenue passengers[?]'" D.E.

18-2 at 82 n.19.

## *II. Discussion*

## A.  Summary Judgment Standard

    Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009).  The Court does not weigh conflicting evidence.  *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007).  Nor does the Court determine the credibility of witnesses.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted).  Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial.  *Id.* at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving party must produce evidence, going

beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment. Under Local Rule 56.1, a party moving or opposing summary judgment must submit a "statement of the material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). The rules require these statements be supported by "specific references" to evidence on the record. S.D. Fla. L.R. 56.1(a)(2). The Local Rules expressly caution, "All material facts set forth in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added). But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

**B. Standard of Review for a System Board Award Issued Under the Railway Labor Act**

As an air carrier operating in interstate commerce, Spirit must comply with the provisions of the Railway Labor Act, 45 U.S.C. §§ 151-188 ("RLA"). *See* 45 U.S.C. § 181; *Loveless v. Eastern Air Lines, Inc.*, 681 F.2d 1272, 1275 (11th Cir. 1982) (citations omitted). Congress enacted the RLA to avoid labor-based interruptions to commerce or to the operation of the railway and airline

industries.  *Stewart v. Spirit Airlines*, 503 F. App'x 814, 817 (11th Cir. 2013) (citing 45 U.S.C. §

151a(1)).  The RLA requires every carrier and its employees to establish a board of adjustment to

deal with grievances arising out of the carrier-employee relationship.  *See* 45 U.S.C. § 184.  In this

case, the Board fulfills this role.

Under the terms of the RLA, a court may overturn a board of adjustment's award only if one

of three circumstances exists: (1) the board of adjustment has failed to comply with the requirements

of the RLA; (2) the board of adjustment's order does not "conform, or confine itself, to matters

within the scope of the [board's] jurisdiction; or (3) a member of the board of adjustment panel that

has made the award has engaged in fraud or corruption.  *Henry v. Delta Air Lines*, 759 F.2d 870, 872

(11th Cir. 1985) (citing 45 U.S.C. § 153(q)).  This scope of review has been described as "among

the narrowest known to the law," *id.* (quoting *Diamond v. Terminal Railway Alabama State Docks*,

421 F.2d 228, 233 (5th Cir. 1970)), and a court may neither review the substance of such an award

for ordinary error nor vacate an award because a judge might have reached a different result.

*Loveless*, 681 F.2d at 1276 (citations omitted).  Instead, substantive grounds for vacating an award

where a board's order does not "conform, or confine itself, to matters within the scope of the

[board's] jurisdiction" exist only in the following three situations: (1) the award is "irrational,"

meaning "wholly baseless and completely without reason," *Loveless*, 681 F.2d at 1276 (citations

omitted); (2) the award has no "rationally inferable" basis from the "letter or purpose of the

collective bargaining agreement," *id.* (citations omitted); or (3) the arbitrator failed to conform to

a specific contractual limitation upon his authority, *id.* (citations omitted); *see also Brotherhood of

Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines*, 455 F.3d 1313,

1315-16 (11th Cir. 2006) (citation omitted).

**C. Tate's Issues on Appeal**

Here, Tate appears to seek review based on the Board's alleged failure to "conform, or confine itself, to matters within the scope of the [board's] jurisdiction." *See* D.E. 29 at 11; *see also* 45 U.S.C. § 153(q).  More specifically, Tate contends that the Board acted in excess of its jurisdiction by

> I.    affirming a termination flowing from a notice of investigation that was untimely under the contract that the Arbitrator was supposed to interpret;
>
> ii.   affirming a termination based on allegations in the termination letter . . . that the Arbitrator determined to be unfounded, i.e.:
>
>> (1)   being non-compliant with the anger management protocol prescribed by the August 2009 agreement;
>>
>> (2)   "us[ing] profanity several times on October 4, 2010 when you were speaking to Aetna Supervisor Steve Parris" when the only evidence of that was Capt. Tate's having conceded saying "you know, what the hell is going on or, you know, you guys need to get your shit together";
>>
>> (3)   the Port-au-Prince takeoff, which the Arbitrator determined was not a ground for termination;
>>
>> (4)   the interaction between Capt. Tate and his first officer, []
>>
>> (5)   an alleged failure to comply with Spirit policy and Federal Aviation Regulations ("FARs") concerning his treating with a licensed clinical social worker and his taking St. John's Wort — which not only was not mentioned in the October 27 letter, but which the Arbitrator ruled was a matter for the FAA, not for a systems board.

D.E. 1 at 10-11.  He further argues that the Board denied him due process

> by essentially trying him on uncharged offenses — e.g., the criminal allegations of which he was found not guilty (two); a bond-revocation

motion that not only was denied, as well as the underlying arrest (that was later nolle prossed), concerning which there was no testimony before the arbitrator other than hearsay affidavits; ex parte restraining orders; a seven-year-old pilot-to pilot confrontation for which Capt. Tate was never disciplined; and a "threat assessment expert's" unscientific assertion that the courthouse records he had found, and what people told him about Capt. Tate, gave him enough information to form an opinion that Capt. Tate is a dangerous pilot.

*Id.* at 11.

## D.  The Board Did Not Act in Excess of Its Jurisdiction

### *1.  The Award May Not Be Vacated for Untimeliness*

Without citation, Tate argues that the Board's award must be vacated because the Board should have rejected Spirit's position since it allegedly failed to comply with the time requirements for issuing a Notice of Investigation to Tate.  This Court disagrees.[3]

In *Union Pacific Railroad Co. v. Sheehan*, 439 U.S. 89 (1978), a railway employee filed an action in state court alleging wrongful discharge and denial of a fair hearing.  While his case was pending, the Supreme Court issued *Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320 (1972), which held that a railroad employee must submit any dispute under a collective-bargaining agreement to the National Railroad Adjustment Board for resolution in accordance with the RLA.  *See Sheehan*, 439 U.S. at 89.  Therefore, the employee dismissed his suit without prejudice and

---

[3]Plaintiff has standing to advance his claims pursuant to 45 U.S.C. § 153 First (q) because they involve Plaintiff's uniquely individual grievance. *See McQuestion v. N.J. Transit Rail Operations*, 892 F.2d 352, 354 (3d Cir. 1990) (holding that the plain language of 45 U.S.C. § 153 First (q) provided an individual employee with standing in federal court to petition Board's decision where the proceedings before the Board were conducted solely to resolve the employee's "uniquely individual grievances"); *Fine v. CSX Transportation, Inc.*, 229 F.3d 1151 (6th Cir. 2000) (finding that the Railway Labor Act permits both individual employees and unions the right to petition a Board decision in district court).  *See also Steward v. AirTran Airways, Inc.*, 221 F. Supp. 2d 1307, 1311 (S.D. Fla. 2002), *aff'd sub nom. Steward v. Mann*, 351 F.3d 1338 (11th Cir. 2003); *Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d 225, n.24 (5th Cir. 2007).

initiated a proceeding before the Adjustment Board.  The Adjustment Board dismissed the employee's claim, however, because he had not filed his appeal to the Adjustment Board within the time limits set forth by the collective-bargaining agreement.

The employee then filed a complaint in United States district court, arguing that the time requirements of the collective-bargaining agreement had been tolled while his case was pending in state court and seeking an order requiring the Adjustment Board to hear the merits of his case. Although the district court found the employee's argument persuasive, it nonetheless granted summary judgment to the railroad because it concluded that the employee had failed to demonstrate the existence of any of the grounds for reversal of an Adjustment Board decision set forth at 45 U.S.C. § 153(q).  The Tenth Circuit reversed.

The Supreme Court held that the Tenth Circuit had exceeded the scope of its jurisdiction to review decisions of the Adjustment Board.  439 U.S. at 92-93.  In particular, the Supreme Court referred to the second § 153(q) factor and explained that the Adjustment Board had acted within its jurisdiction by determining whether the time limitation imposed by the collective-bargaining agreement was tolled by the filing of the employer's state-court action.  *Id*. at 93-94.  As a result, the Court reasoned, judicial review of the Adjustment Board's determination was precluded.  *Id.* at 94.

This case is materially indistinguishable.  Similar to the time limit on appealing to the Adjustment Board imposed by the *Sheehan* collective-bargaining agreement, the Agreement in the pending matter specifically addresses the time limit for an employer to serve a Notice of Investigation.  *See* §19.A.3.  As in *Sheehan*, it was therefore uniquely within the province of the Board to determine whether the employer — in this case, Spirit — had complied with the time requirement.

While Tate suggests that the Board never made such a determination, this Court disagrees. First, the Board denied Tate's Motion for Summary Judgment in which he sought dismissal of all discipline against him based on Spirit's alleged failure to timely provide Tate with a Notice of Investigation.  *See* D.E. 1-5.  Second, Tate again brought up the issue during the three-day hearing before the Board, and the Board expressly acknowledged in its final decision that Tate continued to press the argument.  *See* D.E. 18-2 at 32-33.  Despite these facts, the Board issued a final decision on the merits, thereby implicitly rejecting Tate's timeliness argument.  *See* D.E. 18-2.  This Court is not free to disregard the Board's determination.  *See Sheehan*, 439 U.S. 89.

Moreover, even if it were, this Court would reach the same conclusion.  The Notice of Investigation put Tate on notice that Spirit was investigating his

> inappropriate behavior in violation of Company policies, including but not limited to your conduct while speaking with Aetna and other Spirit employees on or about October 4, 2010, your conduct towards the First Officer on NK 952 PAP-FLL on August 20, 2010 (including conduct after that flight), your conduct towards T. Rowe Price on August 4, 2010, certain allegedly threatening comments to other Spirit pilots, allegations that you were lying on the floor of the cockpit on a flight from SJU on or about February 2010, and your alleged failure to follow Company policies/procedures/standards and to comply with Company instructions including but not limited to the following matters: you [sic] alleged failure to operate NK 952 PAP-FLL on August 20, 2010 according to Company policies/procedures/standards and your failure to comply with the requirements of your August 19, 2009 resolution letter. . . .

D.E. 18-2 at 5-6. While Tate attempts to impose a separate "statute of limitations" on each specifically identified incident noted in the Notice, that is not how the Notice of Investigation is written.  Rather, the Notice refers to a pattern of conduct, describing it as a whole as "inappropriate behavior in violation of Company policies . . . ."  Contrary to Tate's contention, the Notice makes

clear that Spirit views the totality of Tate's actions over an extended period as warranting disciplinary action.  Indeed, Houghton's testimony before the Board likewise confirmed that the Notice of Investigation had been issued as a result of "the overall picture" painted by Tate's lengthy history of incidents.  *See* D.E. 1-6 at 177:20-178:12.

Nor does the fact that the last incident cited in the Notice of Investigation occurred on October 4, 2010, mandate a finding that the issuance of the Notice on October 27, 2010, was untimely.  As noted above, it was the recognition of the totality of events that had occurred over an extended period that gave rise to charges set forth in the Notice of Investigation.  In the course of determining how to proceed, Houghton conducted a basic investigation into the allegations against Tate.  To Houghton, it was significant to his ultimate determination to proceed with discipline that witnesses felt strongly enough about their allegations to place them in writing.  *See id.*  Houghton did not receive the written statements from Gilmore and Singleton-Mana until October 20, 2010, and he did not obtain a written statement from Webster until October 22, 2010.[4]  At that time, Houghton "ha[d], or would reasonably be expected to have [had], knowledge of the circumstances giving rise" to the charges set forth in the Notice of Investigation.  *See* D.E. 1-1 at §19.A.3.  Because the Notice of Investigation was issued four or five working days later, on October 27, 2010, it was timely.[5]

_____

[4]This is not a situation where the pre-investigation period was abusively, or even unreasonably, long, considering the fact that Houghton had only just become the Vice President of Flight Operations on October 1, 2010, and he was investigating a number of incidents that had occurred over several years.

[5]In addition, the manner in which "working days" are to be counted under the Agreement is a matter within the jurisdiction of the Board.  *See* D.E. 1-1 at § 21.C ("The Board shall have jurisdiction over disputes . . . arising out of grievances concerning the ***interpretation or application of any of the terms or provisions in the Agreement*** . . . .").  Section 19.A.3, in turn, requires a Notice of Investigation to be "issued within 15 working days of the date upon which an individual with managerial authority in the Flight Operations Department has, or would

*2.  The Board Did Not Exceed Its Jurisdiction by Affirming the Termination of Tate*

Tate next complains that the Board exceeded its jurisdiction by affirming Spirit's termination decision, even though the Board expressly declined to accept and rely upon some of the information contained within the Notice of Investigation.  Notably, however, Tate does not even attempt to identify a section of the Agreement that might preclude the Board from upholding a disciplinary decision where it declined to credit some portions of the Notice of Investigation.

Presumably, that is because, under the Agreement, determining what to rely upon in affirming, overturning, or modifying a disciplinary order is a matter that falls exclusively within the jurisdiction of the Board.  As the Agreement itself explains, the Board's purpose is to "adjust[] and decid[e] disputes that may arise under the terms of [the] Agreement . . . ."  D.E. 1-1 at § 21.A.  The Agreement further provides that the Board has "jurisdiction over disputes between any pilot covered by this Agreement and the Company submitted to it by [ALPA] arising out of grievances concerning the interpretation or application of any of the terms or provisions in the Agreement . . . ."  *Id.* at § 21.C.1.  As for hearings, the Agreement allows the chairman of the Board to "subpoena evidence and witnesses who may be deemed necessary by the parties to the dispute, or by either party, or by the Board itself."  *Id.* at § 21.F.3.  Beyond that and the requirement of a hearing, the Agreement provides no details regarding what the Board may consider or how the Board must determine whether to uphold a disciplinary decision.  Thus, under the terms of the Agreement, these are matters for the Board to determine.

---

reasonably be expected to have, knowledge of the circumstances giving rise to such investigation."  D.E. 1-1.  Here, the last isolated event occurred on October 4, 2010.  Discounting the day of the event, the day that the Notice of Investigation was issued, weekend days, and the federal holiday of Columbus Day, the Board could have concluded that the Notice of Investigation was issued within fifteen working days of the October 4, 2010, incident.

Nor does Tate suggest that the Board acted irrationally or without reason.  And he is right not to do so.  Regardless of whether Tate agrees with the Board's 82-page decision, the opinion nonetheless makes clear that the Board certainly had reasons for the determination that it made.  In short, Tate has not shown — and cannot demonstrate — that the Board exceeded its jurisdiction in upholding Tate's termination, even though the Board did not credit some of the information that the Notice of Investigation included.

### 3.  The Award Will Not Be Vacated on Due-Process Grounds

Finally, Tate urges that the Board denied his due-process rights by "essentially trying him on uncharged offenses."  D.E. 1 at 11.  In this regard, Tate takes issue with the presentation at the hearing of evidence regarding criminal charges and restraining orders against Tate, Webster's seven-year-old confrontation with Tate, and the threat-assessment expert's opinion regarding Tate.

The Supreme Court has relatively recently opined that whether a reviewing court may set aside a board's decision for failure to comport with due process remains an open question.  *Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 80-81 (2009) ("*Locomotive Eng'rs*").  But in the Eleventh Circuit, that question has been answered in the negative.  *See Henry v. Delta Air Lines*, 759 F.2d 870, 873 (11th Cir. 1985).[6] For this reason alone, Tate's due-process challenge must be denied.

Nevertheless, the Supreme Court has observed that "many of the cases reviewing ostensibly

---

[6]While Tate suggests that the Eleventh Circuit is bound by its predecessor court's discussion in *Hornsby v. Dobard*, 291 F.2d 483, 487 (5th Cir. 1961), suggesting that a board's decision may be set aside for defects rising to the level of due process of the law, the Fifth Circuit issued *Hornsby* in 1961, seventeen years before the Supreme Court issued *Sheehan*, 439 U.S. 89, the case on which the Eleventh Circuit relied in concluding that due-process challenges to board awards are not viable.  Because *Henry* is based on an intervening Supreme Court decision, *Hornsby* no longer constitutes binding precedent in the Eleventh Circuit.

extra-statutory due process objections could have been accommodated within the statutory framework" and that "[t]he statutory review provisions are plainly generous enough to permit litigants to raise all of the simple, common, easily adjudicated, and likely to be meritorious claims that sail under the flag of due process of law. . . ." *Locomotive Eng'rs*, 558 U.S. at 81 n.7 (citation and internal quotation marks omitted). Therefore, the Court considers Tate's "due-process" objections within the framework established by Section 153(q). In so doing, the Court construes Tate's due-process complaints as concerns that the Board exceeded its jurisdiction when it heard and considered evidence regarding the criminal charges, the restraining orders, Webster's seven-year-old conflict with Tate, and the threat assessment expert's opinion about Tate.

This Court disagrees that the Board could not, within its jurisdictional grant, hear and take into account this evidence. As previously discussed, the Board has jurisdiction over all disputes between Spirit and a pilot submitted to it by ALPA, and the Agreement does not specify much at all about how the Board must conduct its hearings or what the Board may consider in determining whether to uphold, modify, or overturn disciplinary decisions. Accordingly, these matters fall within the Board's exclusive jurisdiction and may not be challenged on appeal.

Moreover, it is apparent from the Board's award that it seriously considered and addressed Tate's concerns regarding the evidence described above. *See* D.E. 18-2 at 72-78. After citing and discussing other cases involving off-duty conduct bearing on the termination of a pilot's employment, the Board explained,

> "Related" and "connected acts" may be considered to bolster the employer's initial grounds for discharge. Thus, when the employee's conduct bears a close and logical relation to the original misconduct giving rise to the discharge, post-discharge conduct is relevant and considered by arbitrators. . . . Additionally, to the extent that a pilot's

conduct, whenever discovered, gives rise to his overall physical or mental ability to ferry an aircraft, it is relevant evidence either to support management's initial decision or, alternatively, as evaluative evidence with respect to the question of a remedy requested by the pilot. . . . **Anything that an airline captain does, on or off-duty, is fair game if relevant to his physical or mental capacity to fly an airplane. Any ruling to the contrary would be non-sensical and invite judicial review**."

D.E. 18-2 at 72-73 (citation omitted).

Finally, even if Tate could bring a due-process challenge, the Court disagrees with Tate's fundamental premise that he was denied due process. A review of the record reveals plainly that Tate had an extensive opportunity during the three-day hearing to present his side of the story when he was confronted with the challenged evidence. Nor did Tate request additional time to find his own evidence to rebut the evidence he now challenges. For all of these reasons, Tate cannot succeed on his due-process claim here.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** Spirit's Motion for Summary Judgment [D.E. 17].

**DONE and ORDERED** at Fort Lauderdale, Florida, this 12th day of July 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies to:
The Honorable Patrick M. Hunt

Counsel of record